# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| GALE S. MAY, | : | |
| Plaintiff, | : | Case No. 3:09cv00090 |
| vs. | : | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE, Commissioner of the Social Security Administration, | : : | Magistrate Judge Sharon L. Ovington |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.     INTRODUCTION

Plaintiff Gale S. May applied for Disability Insurance Benefits and Supplemental Security Income claiming she was under a disability in part due to back, neck, and shoulder injuries as well as pain in her neck, shoulders, lower back, and hand. *See* Tr. 62-63, 285, 289. After initial administrative denials of her applications, Administrative Law Judge (ALJ) Melvin A. Padilla held a hearing and later denied Plaintiff's applications. (Tr. 16-24). In doing so, ALJ Padilla concluded primarily that Plaintiff was not under a "disability" within the meaning of the Social Security Act. *Id*.

ALJ Padilla's decision eventually became the Social Security Administration's final decision. This Court has jurisdiction to review such final decisions. *See* 42 U.S.C. §§405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), the administrative record, and

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

the record as a whole.

Plaintiff seeks an Order reversing the ALJ's decision or, at a minimum, remanding this case to the Social Security Administration to correct certain errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II.  FACTUAL BACKGROUND

### A.  Plaintiff, Her Surgery, and Her Testimony

Plaintiff was age forty-nine on the date her claimed disability began and was thus considered to be a "younger person" for social security purposes. *See* 20 C.F.R. §§404.1563(C), 416.963(C). At the time of the ALJ's decision, she was age fifty-three or a person "closely approaching advanced age." *See* 20 C.F.R. §§404.1563(d), 416.963(d).

Plaintiff has a high school education. (Tr. 105). From 1973 until 2003 Plaintiff worked as an administrative assistant for a non-profit organization. (Tr. 63, 70).

Plaintiff asserts that her "troubles began on June 11, 2004, when she fell while trying to climb into a first floor window of her house." (Doc. #7 at 3). Emergency room records on that date state, "This is a 49-year-old female who states that apparently she lost her house key. She tried to climb in a first floor window and fell forward on to her head and now has pain in her neck and upper back and tingling into her hands and arms." (Tr. 129).

A few days later Plaintiff underwent surgery, a cervical discectomy at C5-6 and a cervical fusion performed by Dr. Sybert. (Tr. 149-50). Two days later, while still hospitalized, an x-ray showed that Plaintiff had a dislocated left shoulder (glenoumeral dislocation). (Tr. 147). She underwent a reduction of this joint under anesthesia by Dr. Pugh. *Id.*

An x-ray taken a month later (July 2, 2004), revealed "normal alignment of the glenohumeral joint and left acromioclavicular joint." (Tr. 163). But the x-ray further showed a new avulsion fracture off the greater tuberosity of the left humerous. *Id.* Other

2

x-ray findings concerning her left shoulder appeared stable including a large Hill-Sachs deformity of the left humeral head and an osseous Bankart lesion of the inferior glenoid related to her original dislocation. *Id*.

During the ALJ's hearing, Plaintiff testified that she is unable to work because she cannot perform activities without sitting and resting. (Tr. 185). For example, after she takes a bath she has to sit and relax for a couple of hours because she cannot lift her arms back up. (Tr. 285). She cannot lift more than about ten pounds without straining her neck and back. *Id*. She believes she has nerve damage in her arms, and she has swelling from her "elbows to elbows across [her] back." *Id*.

Plaintiff testified that she has pain in her neck, shoulders, hand, and lower back. (Tr. 285). She has neck pain daily. She explained, "I get a catch in the back ... by the base of my neck, and it just feels like it is straining sometimes on the side, and I can't turn my head and it pops all the time. It gets caught." *Id*. When she sits she puts "a roll behind [her] neck to keep the strain down." (Tr. 287). Her shoulder pain is related to, not separate from her neck pain. She noted that her shoulder pain is constant; it never goes away. *Id*. She described it as a throbbing pain – hot, burning, and constricting. (Tr. 288). To treat her pain, Plaintiff takes prescription Darvocet, and she uses Biofreeze (an external rub-on product) along with heating pads and ice. (Tr. 289).

Plaintiff has had back pain since June 2004, presumably since her injuries caused by the fall from the window and the resulting surgery. Her back sometimes feels out of alignment. She also feels pinching, which radiates down her leg if she sits too long. (Tr. 289). She feels back pain two or three times per week, sometimes more often, depending on her activity. (Tr. 289-90).

Plaintiff also has "different kinds of pains ... [t]hat travel." (Tr. 291). She explained, "Sometimes it is in my foot, and I went to the emergency room because I couldn't go to the doctor. They said I had a torn Achilles tendon but I was sitting down, and then it gets in my legs, and it just travels around. Now lately I've had some throbbing

pains in this hand. This thumb was like smashed and it had no feelings...." (Tr. 291).

As to medication side effects, she experiences constipation. (Tr. 292). Her physician prescribes another medication to help with that but she does not take it on a regular basis. *Id*.

Plaintiff testified that she can walk for about one-half hour before she needs to sit down and rest. (Tr. 292-93). She can stand in one place for about one-half hour before needing to sit. (Tr. 293). It seems to her like she can sit in a soft chair for about one hour. A hard chair limits her sitting to ten minutes, so she does not sit in hard chairs. *Id*.

Plaintiff attends aquatherapy for her neck and shoulders, which helps for a couple of days. But she must take pain medication and she must rest before going to aquatherapy. (Tr. 286). Physical therapy for her back did not help. (Tr. 290). She sees only her primary care physician and does not have cash to see other physicians. (Tr. 287). She does not see a back specialist; she needs "to get the money together to pay." (Tr. 290).

As to her activities, Plaintiff testified that she can cook a little, like making an egg, but her daughter does most of the cooking. (Tr. 295). Plaintiff does not wash dishes. She tries to sweep or mop but "it doesn't work." *Id*. She tries every day to do normal things. Yet she cannot vacuum. She cannot do her own laundry. When she goes grocery shopping, "they do the lifting and carrying. [She] just tells them what [she] wants." (Tr. 296). She does not make her bed or dust. She cannot use the computer because she cannot extend her arms long enough to use the mouse. (Tr. 296). She goes to Bible study every week. She stopped going to church services because "too many people want to hug you." (Tr. 296). Family, friends, and neighbors visit her at her house. (Tr. 297). She does not watch much television. She tries to do crafts but does not get anything done because she starts to hurt. *Id*. She does not work in the garden or yard. (Tr. 297-98). She went to Florida in 1997 with her daughter. Her daughter drove; Plaintiff rode. (Tr. 298).

4

### B. Additional Evidence

In mid-July 2003, about one month after her cervical-fusion surgery, Dr. Sybert examined Plaintiff. (Tr. 175-76). He observed, "[Plaintiff] ambulates in a narrow steady fashion. Her anterior cervical incision is well healed. The patient has good strength on bench testing. She has decreased sensation over the right deltoid region. Reflexes are within normal limits.... Plain radiographs today reveal good instrumentation alignment at C5-6 without failure or migration of the construct." (Tr. 175).

In early September 2003, Dr. Sybert again examined Plaintiff. (Tr. 173-74). She reported 90% relief of arm pain. She did not have any neck pain. She complained of right thumb pain. (Tr. 173). Dr. Sybert examined Plaintiff's shoulders finding a diminished range of motion in her left shoulder, although she could abduct to 90° Yet she had difficulty putting her left hand to her ear. Dr. Sybert found Plaintiff's cervical range of motion "good." *Id*. He assessed her as having made good clinical progress after her cervical-fusion surgery. *Id*. He thought she "would benefit from pendulum exercises to the left shoulder as she may be developing some early frozen shoulder symptoms." (Tr. 173-74).

On September 28, 2004, Plaintiff returned to see Dr. Sybert, who reported, "She flexes her neck forward and develops a wave of tingling across [her] chest and into her upper thighs." (Tr. 170). Dr. Sybert characterized this as "Lhermitte's phenomenon." *Id*. He sent Plaintiff for an MRI "as it is possible she has developed a syrinx or even an adjacent segment disc herniation that is not noted on these plain radiographs and would surely explain these symptoms." (Tr. 170). The MRI report stated the diagnostic impression as, "posterior bulging may be present at C4-C5, C5-C6 and C7-T1. Neural foraminal narrowing is suspected bilaterally and minimally, right slightly worse than left." (Tr. 171-72). Upon reviewing the MRI, Dr. Sybert wrote, "There are post-fusion changes noted at C5-6 but no evidence of any considerable spinal cord compression or canal stenosis. At this point, I will keep her symptoms under observation." (Tr. 169).

5

In December 2004, six months after Plaintiff's cervical-fusion surgery, she reported to Dr. Sybert "good relief of her symptoms." (Tr. 168). Dr. Sybert noted, "She has some residual hand pain on the right, but overwhelmingly is improving with time. She has no more symptoms of spinal cord irritation." *Id*. Dr. Sybert further noted, "Overall I am pleased with her progress. She has made a near complete recovery." *Id*.

In May 2005, eleven months after her surgery, Plaintiff returned to see Dr. Sybert, who wrote, "She does report being struck by lightning at the time of her injury, which caused her to fall on her head out of a window." (Tr. 166). Dr. Sybert indicated that Plaintiff's prior symptoms of "Lhermitte's phenomenon with electrical sensations radiating throughout the body with flexion/extension of the neck have subsequently resolved." *Id*. Plaintiff, however, was experiencing neck pain with "some swelling, which is transient mostly in her right proximal arm. She also reports the thumb feeling 'swollen.'" (Tr. 167). Plaintiff thus had "[m]ultiple neurologic complaints status post traumatic accident with fracture dislocation at C5-6." (Tr. 167). Dr. Sybert recommended that Plaintiff see a neurologist "for her residual symptoms." *Id*. And he noted that he would see Plaintiff on an "as needed basis for the cervical spine." *Id*.

Plaintiff explains in her Statement of Errors that at this point in time she had difficulty obtaining further treatment from specialists because her insurance ran out. (Doc. #7 at 5).

In July 2005 Dr. Congbalay reviewed Plaintiff's records at the request of the Ohio Bureau of Disability Determinations (Ohio BDD). (Tr. 191-99). Dr. Congbalay opined that Plaintiff could perform the exertional requirements of light work. (Tr. 193). She explained, in part, that Plaintiff had good relief of her symptoms in December 2004 and an x-ray showed solid fusion. (Tr. 193). Dr. Congbalay recognized that in May 2005 Plaintiff complained on neck pain with transient swelling in her right arm and her thumb felt swollen. Dr. Congbalay then noted that various exam finding from that date including, for example, normal reflexes and "Lhermitte's phenomenon had resolved."

6

(Tr. 193-94). According to Dr. Congbalay, Plaintiff had limited ability to reach overhead with her arms and could do so only occasionally. (Tr. 195). Dr. Congbalay believed that Plaintiff's "allegations are partially credible. Her pain symptoms and limitations are in excess when compared with the objective evidence." (Tr. 197). On the date Dr. Congbalay reviewed the record, it did not contain a treating or examining source statement. (Tr. 198).

Plaintiff's primary care physician is Dr. Ahmed. (Tr. 220-25, 243-48, 263-64). Dr. Ahmed wrote a letter in June 2008 indicating that he had been treating Plaintiff since September 2005 for Hypertension, Obesity, Hyperlipidemia, chronic neck pain, and low back pain. (Tr. 259). Dr. Ahmed also wrote:

> She has a history of being hit by lightning and had a fracture C-5 vertebra of the neck. She had surgery at OSU in 2004 on her neck. She complains of pain in arms, shoulders and right thumb. Gayle says she is unable to lift more than 10 lbs. Due to neck and arm pains. Gale had an MRI of the lower spine done on March 5, 2007 and was evaluated on 4/4/2007 by Dr. Koja, Neurosurgeon. Dr. Koja said she has Moderate Degenerative Disease and no surgical lesions. Dr. Koja advised her to go back to OSU for follow up on her neck problem, as surgery was done there in 2004.
>
> Between 5/1/2007 and 5/5/2008, patient did not keep any follow up appointments. Gale was seen in the office on 5/5/2008. She complained of neck and lower back pain. She was upset and crying due to her chronic pain. She has moderate restriction of ROM of neck and lumbar spine....
>
> Due to her overall health status and diagnosis as mentioned, she can only do light duty job for 4 hours per day.

(Tr. 259-60). Dr. Ahmed completed a form containing his opinions about Plaintiff's physical abilities to do work-related activities. The opinions he indicated in the form were more specific, though generally consistent with those in his letter. (Tr. 259-62). He indicated in the form his opinions that Plaintiff could occasionally lift 6 to 10 pounds, but no more; he could stand/walk for 4 hours without interruption, but no more than 5 hours per day; she could sit for 6 hours per day; she could frequently move her head/neck side-

7

to-side, up & down; she could occasionally reach/extend overhead bilaterally; and she could occasionally perform some type of grasping bilaterally.[2] (Tr. 261-62).

Dr. Vogel reviewed Plaintiff's records for the Ohio BDD in January 2006. It appears that he essentially copied Dr. Congbalay's July 2005 report, thus indicating his agreement with that report. Dr. Vogel did not provide any additional explanation for his opinions. (Tr. 226-32).

## III. ADMINISTRATIVE REVIEW

### A. "Disability" Defined and the Sequential Evaluation

The definition of the term "disability" is essentially the same for both Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B. The ALJ's Decision

The ALJ resolved Plaintiff's disability claim by using the five-Step sequential evaluation of evidence required by the Regulations. *See* Tr. 16-24; *see also* 20 C.F.R.

---

[2] The copy of this form in the administrative record is partially blacked out. (Tr. 261). Plaintiff asserts that it indicates Plaintiff could "only occasionally perform grasping bilaterally." (Doc. #7 at 7).

8

§§404.1520(a)(4), 416.920(a)(4).[3]

The ALJ concluded, in pertinent part, that Plaintiff had the severe impairments of cervical and lumbar degenerative disc disease with residuals of neck surgery, and obesity (Step 2). She did not have an impairment, alone or in combination with other impairments, that met or equaled the criteria in the Commissioner's Listing of Impairments (Step 3). (Tr. 20). The ALJ assessed Plaintiff's Residual Functional Capacity (Step 4) as follows:

> [T]he claimant has the residual functional capacity to perform light work ... except that she must alternate positions every thirty minutes. She cannot work climbing ladders, scaffolds, or at unprotected heights; reaching overhead is limited to occasionally; and she is limited to no fast-paced work or strict production quotas.

(Tr. 20). The ALJ further concluded that Plaintiff could not perform her past relevant work (also Step 4). *Id.* And the ALJ found that Plaintiff could perform a significant number of jobs existing in the national economy (Step 5).

As a result of the ALJ's findings throughout the sequential evaluation, he concluded that Plaintiff was not under a disability and, as a result, was not eligible for DIB or SSI. (Tr. 19-24).

## IV. JUDICIAL REVIEW

Judicial review of an ALJ's decision determines whether substantial evidence in the administrative record supports the ALJ's factual findings. *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "more than a scintilla of evidence but less than a

---

[3] The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations.

preponderance..." *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Judicial review for substantial evidence is deferential not *de novo*. *See Cruse v. Commissioner of Social Sec.* 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v. Secretary of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The Court's agreement or disagreement with the ALJ's findings plays no role in the substantial evidence review, and no significance attaches to contrary evidence in the record – if other substantial evidence supports the ALJ's findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

Reviewing for substantial supporting evidence is not the stopping point of judicial analysis. Courts also examine the administrative decision to determine whether the ALJ applied the correct legal criteria. *See Bowen*, 478 F.3d at 746. If the ALJ did not, the decision may not be upheld even when substantial evidence supports the ALJ's findings. *See id.* For example, a decision will not be upheld where the ALJ failed to apply the standards mandated by the Social Security Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See Bowen*, 478 F.3d at 746 (and cases cited therein). Through *Bowen* and other recent Sixth Circuit cases, an ALJ's failure to apply the correct legal criteria – at least when evaluating medical source opinions – mandates further judicial review for harmless error. *Bass II v. McMahon*, 499 F.3d 506, 512 (6th Cir. 2007); *see Bowen*, 478 F.3d at 747-49; *see also Wilson*, 378 F.3d at 547-49 (offering examples of possible *de minimis* errors). Consequently, if the ALJ erred by not applying the correct legal criteria but the error was harmless, the decision should be affirmed. *See Bass II*, 499 F.3d at 512 (and cases cited therein).

**V.     DISCUSSION**

A. **Medical Source Opinions**

**1.**

Plaintiff contends that the ALJ erred in his rejection of the opinions provided by her treating physician, Dr. Ahmed, by failing to indicate what standards he used to evaluate his opinions and by only mentioning Dr. Ahmed's opinion that she was unable to sustain and eight-hour workday. Plaintiff maintains that it is not entirely clear that the ALJ considered all of Dr. Ahmed's opinions, especially the limitations on lifting and grasping/handling

The Commissioner argues that the ALJ reasonably afforded Dr. Ahmed's opinions diminished weight by very clearly articulating his basis for rejecting those opinions.

The treating physician rule, when applicable, requires ALJs to place controlling weight on a treating physician's opinion rather than favoring the opinion of a nonexamining medical advisor, or an examining physician who saw a claimant only once, or a medical advisor who testified before the ALJ. *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004); *see Lashley v. Secretary of Health and Human Services,* 708 F.2d 1048, 1054 (6th Cir. 1983); *see also* 20 C.F.R. §404.1527(d)(2), (e), (f). A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. *Wilson*, 378 F.3d at 544; *see Walters v. Commissioner of Social Security*, 127 F.3d 525, 530 (6th Cir. 1997); *see also* 20 C.F.R. §404.1527(d)(2).

If a treating physician's opinion is not given controlling weight, then it must be weighed against other medical source opinions under a number of factors set forth in the Commissioner's Regulations – "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. §404.1527(d)(2)).

11

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. §404.1527(d)(1). However, the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views nonexamining sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization. *See* 20 C.F.R. §404.1572(d), (f); *see also* Ruling 96-6p at *2-*3.

**2.**

When assessing Plaintiff's residual functional capacity, the ALJ indicated that he considered the opinion evidence "in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs [Social Security Rulings] 96-2p, 96-5p and 96-6p." (Tr. 21). The ALJ was correct in his citations to these pertinent Regulations and Rulings as providing the foundational legal criteria for the evaluation of medical source opinions. Yet the ALJ's conclusory statement alone merely confirms, at most, what this Court presumes: that the ALJ understands the legal criteria applicable to the evaluation of the medical source opinions. This Court's review must go further by determining whether the ALJ actually applied the correct legal criteria to the evaluation of medical source opinions. *See Bowen*, 478 F.3d at 746 ("This court will uphold the Commissioner's decision if it is supported by substantial evidence and if the Commissioner applied the correct legal criteria.").

A review of the ALJ's decision reveals he considered the nature, the extent, and the frequency of treatment Dr. Ahmed provided to Plaintiff. *See* Tr. 22. These were correct factors to apply when considering whether to apply controlling weight to Dr.

12

Ahmed's opinions. *See* 20 C.F.R. §404.1527(d)(2). The ALJ also found that Dr. Ahmed did not provide any detailed, objective findings with regard to Plaintiff's functioning, and the ALJ noted, "There is no evidence of any detailed physical exams." (Tr. 22). These are proper considerations under the Regulations when determining whether to apply either controlling or any weight to Dr. Ahmed's opinions. *See* 20 C.F.R. §404.1527(d)(2)-(3). The ALJ further recognized that Dr. Ahmed is not an orthopedic or spine specialist, a correct regulatory factor to consider. *See* 20 C.F.R. §404.1527(d)(5). The ALJ also found that all Dr. Ahmed "basically said was that she 'complained of neck and lower back pain' and that she had 'moderate restriction of ROM of neck and lumbar spine.' His narrative is a very poor and unsupported endorsement for disability." (Tr. 22). These are proper considerations under the Regulations. Section 404.1527(d)(3) states, for example, "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion...." For all these reasons, the Commissioner is correct that the ALJ's rejection of Dr. Ahmed's opinions mirrors the factors outlined in the Regulations. *See* 20 C.F.R. §404.1527(d)(2), (3), (5). And as a result, the ALJ applied the correct legal criteria to his evaluation of Dr. Ahmed's opinions and provided good reasons for rejecting his opinions, as the Regulations require. *See* 20 C.F.R. §404.1527(d)(2).

Plaintiff's contention that the ALJ did not consider Dr. Ahmed's opinion concerning her limited ability to grasp/handle lacks merit. Although the ALJ did not specifically address this aspect of Dr. Ahmed's opinions, *see* Tr. 22, the ALJ's reasons for rejecting Dr. Ahmed's opinions – particularly the lack of supporting explanation or supporting objective medical evidence – applies to this aspect of Dr. Ahmed's opinion. This is so because Dr. Ahmed merely checked boxes concerning Plaintiff's grasping/handling limitation without providing any supporting explanation in either the form he completed (Tr. 261-62) or the letter he wrote (Tr. 260-61). The ALJ therefore

did not err by not specifically addressing this aspect of Dr. Ahmed's opinion. And, even if the Regulations required the ALJ to specifically address this aspect of Dr. Ahmed's opinions, his omission constituted harmless error because in light of Dr. Ahmed's lack of supporting explanation or objective evidence, his grasping/handling limitations were so patently deficient that the Commissioner could not possibly credit them. *See Wilson*, 378 F.3d at 547; *see also Sharp v. Barnhart*, 152 Fed. Appx. 503, 508 (6th Cir. 2005).

In addition, contrary to Plaintiff's contention, it was not error for the ALJ to consider her credibility as part of his evaluation of Dr. Ahmed's opinions because Dr. Ahmed's opinions lacked meaningful supporting explanation or objective medical evidence and thus appeared to be based largely on her subjective reports. *Smith v. Commissioner of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007)(not error to reject physicians' opinions when they based their opinions on the claimant's reporting of symptoms and ALJ found claim not credible); *see also Stiltner*, 244 Fed. Appx. 685, 689 (6th Cir. 2007).

Accordingly, Plaintiff's challenges to the ALJ's evaluation of Dr. Ahmed's opinion lack merit.

### 3.

Plaintiff argues that the ALJ erred by relying on the opinions of the state agency physician, Dr. Congbalay, because the ALJ failed to explain what regulatory factors led him to credit Dr. Congbalay's opinions.

The specific Regulation at issue requires ALJs to evaluate opinions provided by state agency medical sources "using the relevant factors ... such as the physician's or psychologist's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations provided by the physician or psychologist, and any other factors relevant to the weighing of the opinions." 20 C.F.R. §404.1527(f)(2)(ii). The Commissioner is therefore correct to the extent he recognizes that this Regulation required the ALJ to <u>consider</u> Dr. Congbalay's opinions. Yet the Commissioner argues

more by asserting that the Regulations did not require the ALJ to explain his application of the factors in the degree of detail Plaintiff suggests. This contention triggers the next sentence of this Regulation, which states:

> Unless the treating source's opinions is given controlling weight, the administrative law judge <u>must explain</u> in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.

20 C.F.R. §404.1527(f)(2)(ii) (emphasis added). The plain meaning of the verb "explain" – "to make manifest: present in detail" or "to give reason for"[4] – demands more than a conclusory statement by the ALJ that he is fully crediting or relying on a medical source's opinion. If a conclusory statement was sufficient, this Regulation would have said so by instead requiring ALJs to "state "or to "indicate" the weight given to state agency medical sources. In addition, by equating the explanation an ALJ must give when evaluating state agency medical sources with the explanation given to treating and other medical sources, this Regulation requires the ALJ to provide at least some explanation – if not a good explanation, as required of treating physicians, *see* §404.1527(d)(2) – of the weight given to state agency medical source opinions.

Finding a conclusory statement by the ALJ sufficient would also eliminate the possibility of meaningful review in both the Appeals Council and the courts. Without some reasons why the ALJ credited a state agency medical source, there is no way to determine whether the ALJ actually applied the correct legal criteria, i.e., the regulatory factors listed in §404.1527(d), or whether the ALJ merely accepted the opinion without evaluating it under the factors required by the Regulations, *see* 404.1527(f)(2)(ii), and Rulings, *see* Soc. Sec. Ruling 96-6p, 1996 WL 374180 (reiterating that ALJs "must explain the weight given to these opinions" and further explaining, that the opinions of

---

[4] *E.g.*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) at 801.

these medical sources "can be given weight only insofar as they are supported by evidence in the case record, considering such factors as ... supportability ... consistency ... [and] specialization...."). And it is difficult to understate the significance of these factors under the Regulations since they reiterate this requirement no less than three times. *See* 20 C.F.R. §404.1527(d) ("we consider all of the following factors in deciding the weight to give any medical opinion...."); *see* also 20 C.F.R. §404.1527(f)(ii) (factors apply to opinions of state agency consultants); 20 C.F.R. §404.1527(f)(iii) (same as to medical experts' opinions); Social Security Ruling 96-6p, 1996 WL 374180 at *2 (same). Similarly, the Rulings explain:

> [T]he opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion..., the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist. The adjudicator must also consider all other factors that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State agency medical or psychological consultant.

Soc. Sec. Ruling 96-6p, 1996 WL 374180 at *2. Meaningful appellate review to determine whether an ALJ complied with such specific requirements would be difficult – if not impossible – without some explanation by the ALJ indicating what factors led him to credit the state agency medical source opinions.

In the present case, the ALJ only provided the following conclusory statement concerning Dr. Congbalay's opinions; "The physical restrictions are based in general on the assessment for light work by the BDD." (Tr. 22). Thus, although the ALJ stated what weight he applied to Dr. Congbalay, he never stated why such weight was due. Consequently, the ALJ's decision to not "explain the weight..." given to Dr. Congbalay's opinion in contrast with the mandate set forth in §404.1527(f)(2)(ii).

This error was not harmless because Dr. Congbalay's July 2005 record review

16

preceded the date of Plaintiff's lower back injury in February 2007. (Tr. 244, 246). She underwent an MRI on March 6, 2007, which Dr. Congbalay never saw and which revealed in part a "very small posterior disc protrusion" at L4-L5 and a "broad posterior disc protrusion at the L5-S1 level...." (Tr. 236-37). No state agency medical source provided an opinion about the significance, or lack of significance, of the problems revealed by this MRI. No medical expert testified during the ALJ's hearing. Instead, the ALJ accounted for these problems by adding certain limitations to his assessment of Plaintiff's Residual Functional Capacity. *See* Tr. 22. In doing so, he did not rely on any medical test results or opinion evidence of record. *See id*.

According to the Commissioner, this was not error because the ALJ was charged with the duty to assess Plaintiff's Residual Functional Capacity, which he did by adding certain limitations. The ALJ is indeed charged with the duty to assess a claimant's Residual Functional Capacity. *See* 20 C.F.R. §404.1527(e)(2). Yet substantial evidence must support the limitations he sets. Dr. Congbalay's opinions do not support the additional limitations the ALJ set, and neither the ALJ nor the Commissioner (presently) relies on specific evidence of record to support the ALJ's additional limitations. *See* Tr. 22.

Accordingly, Plaintiff's challenges to the ALJ's reliance on the state agency medical source's opinions are well taken.[5]

### B. <u>Remand Is Warranted</u>

Plaintiff does not seek a judicial award of benefits, but she does seek a remand to the Social Security Administration. (Doc. #7 at 17).

---

[5] In light of the above review, and the resulting need for remand of this case, an analysis of the parties' remaining arguments, including those focusing on the ALJ's assessment of Plaintiff's credibility, is unwarranted.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

Remanding this case for further consideration is warranted in light of the above-described errors by the ALJ. On remand the ALJ should be instructed to update the medical record; to conduct the required five-step sequential evaluation required by the Regulations; and in so doing, to evaluate the medical source opinions and other evidence of record as required by the Commissioner's Regulations and Rulings.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's final non-disability decision be vacated;

2. No finding be made regarding whether Plaintiff is under a "disability" within the meaning of the Social Security Act;

3. This matter be remanded to the Social Security Administration under Sentence Four of 42 U.S.C. §405(g) for further proceedings consistent with this Report and Recommendations, and any decision adopting this Decision; and

4. The case be terminated on the docket of this Court.

November 17, 2009                                  s/Sharon L. Ovington
                                                   Sharon L. Ovington
                                                   United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Am,* 474 U.S. 140 (1985).